## In re SALOMON et al.

### (Circuit Court, S. D. New York. October 13, 1891.)

1. CUSTOMS DUTIES—CLASSIFICATION—CONSTRUCTION OF STATUTE—COMMERCIAL DESIGNATION.

  Where it appears that a word used in the tariff law had at the time of the passage of the tariff act a special and technical trade meaning, but the language of the section or paragraph in which the word is used in the act shows clearly that such technical meaning could not have been the one which congress placed upon the word, such technical trade meaning cannot be adopted by the court in construing the statute.

2. SAME—CORDOVAN LEATHER.

  Cordovan leather cut during the process of dressing into a shape suitable for recutting into shoe-vamps was, under the tariff act of March 3, 1883, properly dutiable as "dressed upper leather," under the provision therefor in Schedule N, par. 461, at 20 per cent. *ad valorem*, and not as a "manufacture or article of leather," under paragraph 463 of the same schedule, at 30 per cent. *ad valorem.*

At Law.

Application under section 15 of the act of June 10, 1890, entitled "An act to simplify the laws in relation to the collection of the revenue," (26 U. S. St. at Large, 131,) by Salomon and Phillips, importers, for a review of the decision of the United States general appraisers, affirming the decision of the collector of the port of New York, as to the rate and amount of duty assessable upon certain merchandise imported by them per steamship Wieland, August 23, 1890. The merchandise in question consisted of certain pieces of Cordovan leather. The leather was made by tanning, dressing, and currying skin or hide taken from the back part or hips of the horse. The leather was designed to be made into shoe-vamps. The board of general appraisers had held that the goods in question were in fact vamps in the condition in which they were imported, but the undisputed testimony taken by the court showed that a further process of cutting and shaping was necessary to transform them into the articles commercially called "vamps," and that the shape in which they had been imported was one given to them in the process of dressing. The goods in question had been classified by the collector as "manufactures of leather," and assessed for duty at 30 per cent. *ad valorem*, under paragraph 463, Schedule N, Act March 3, 1883. They were claimed by the importers to be dutiable at 20 per cent. *ad valorem* as "dressed upper leather," under paragraph 461 of the same act and schedule. A number of witnesses called on behalf of the collector testified that the term "upper leather" had in the leather trade a special, technical meaning, and was confined to waxed cowhide. These witnesses, as well as witnesses called on behalf of the importers, stated that in a general sense all leather used for the upper part of a shoe was called "upper leather."

*Curie, Smith & Mackie,* (*W. Wickham Smith,* of counsel,) for importers.

*Edward Mitchell,* U. S. Atty., and *James T. Van Rensselaer,* Asst. U. S. Atty., for collector.

LACOMBE, Circuit Judge, (*orally*.)   The articles imported here seem, from the testimony, to be within the meaning of the phrase "dressed upper leather," as used in the tariff act of 1883, par. 461.   It appears that there are two commercial meanings given to that phrase, one of which applies generally to the different kinds of leather which are used for making the upper part of a shoe, in contradistinction to the leather which is used for the sole or under part; the other, a very restricted, technical meaning, is confined to waxed cowhide.   It is apparent that congress did not use the term "dressed upper leather" with this restricted meaning, because the phraseology of the section (omitting the adjectives) is:   "Calf-skins  *  *  *   and dressed upper leather of all other kinds." Therefore, inasmuch as congress considered that calf-skins were a variety of dressed upper leather, it evidently did not have in mind the peculiar and restricted meaning of that term referring only to waxed cowhides, but intended to cover all varieties of upper leather as known to the trade; and this importation, according to the testimony, is one of the kinds of dressed upper leather which the trade knows.   The board of appraisers seems to have been misinformed as to what these articles are.   The testimony now taken shows pretty conclusively that they are not "shoe-vamps,"—that is, "pieces cut from dressed upper leather for the fore-part of a shoe, ready for making up."   An additional process of cutting is required to transform these articles into the shoe-vamp of trade and commerce.   It is true that the articles are not in the shape in which the horse-hide was before it was subjected to the process of tanning and dressing, but it appears that the shape which they now have was given to them in the process of dressing.   In other words, they were cut into this shape before they became dressed upper leather at all, and we have not a case where dressed upper leather has been, as the board of appraisers say, "by the labor of the cutter, a skilled artisan, converted from mere upper leather into vamps designed for a specific purpose."   I am therefore of the opinion that they are not covered by paragraph 463 as manufactures of leather, but are to be classified under paragraph 461 as dressed upper leather.   The decision of the collector and of the board of appraisers is reversed; the articles should be classified under paragraph 461.